LUIGI MALAFRONTE *vs.* JOSEPH MILONI.

MARCH 28, 1913.

PRESENT: Johnson, C. J., Parkhurst, Sweetland, and Vincent, JJ.

(*1*)  *Dogs.*

Gen. Laws, 1896, cap. 111, § 3, (now Gen. Laws, 1909, cap. 135, § 3) pro-
viding that "if any dog shall assault or bite or otherwise injure any person
while travelling the highway or out of the enclosure of the owner or keeper
of such dog, the owner or keeper shall be liable to the person aggrieved as
aforesaid for all damage sustained, to be recovered in an action of trespass
on the case or in an action of trespass, with costs of suit" is broad enough
to sustain an action of trespass on the case to recover damages for injuries
to plaintiff sustained by being thrown out of his wagon when his horse ran
away, when attacked and bitten by defendant's dog.

TRESPASS ON THE CASE.   Heard on exceptions of plaintiff
and sustained.

VINCENT, J.   This is an action of trespass on the case to
recover damages for certain injuries to the plaintiff and his
horse alleged to have been caused by the defendant's dog.
The plaintiff claims that while he was driving his horse and
wagon in one of the public streets of Bristol, Rhode Island,
the defendant's dog attacked and bit the horse, causing the
horse to become unmanageable and uncontrollable and
finally to run away and throw the plaintiff out of the wagon,
whereby he sustained severe injuries besides incurring some
expenses in the treatment of the injuries to the horse.   The
plaintiff's declaration is in two counts.   The first count
alleges that by reason of said defendant's dog biting said
plaintiff's horse on a public highway, the said plaintiff's
horse became wholly uncontrollable and bolted and ran away
for a distance of about thirty feet, when the wagon collided
with the curbstone with sufficient force to throw the plaintiff
from his said wagon to the sidewalk, whereby he sustained
injuries to his arm of a permanent character.

The second count is for injuries done to the horse which
was bitten and wounded by the defendant's dog.   At the

conclusion of the testimony the trial court, upon motion, directed a verdict for the defendant upon the first count of the plaintiff's declaration upon the ground that Section 3 of Chapter 111 of the General Laws of 1896, that being the statute in force at the time of the alleged injury, was not broad enough to cover injuries which did not proceed from the direct attack of the dog upon the person of the plaintiff.

The case went to the jury upon the second count and a verdict was returned therein in favor of the plaintiff for the sum of five dollars, that being the full amount of the damages shown to have been sustained by the plaintiff on account of injuries to his horse.

(1)     Section 3, Chapter 111, General Laws of 1896, upon which the plaintiff's action is based, is as follows: "If any dog shall kill, wound or worry, or assist in killing, wounding or worrying, any sheep, lamb, cattle, horse, hog, swine, fowl, or other domestic animal, belonging to or in the possession of any person, or shall assault or bite or otherwise injure, any person while travelling the highway or out of the enclosure of the owner or keeper of such dog, the owner or keeper of such dog shall be liable to the person aggrieved as aforesaid, for all damage sustained, to be recovered in an action of trespass on the case, or in an action of trespass, with costs of suit; and if afterwards any such damage be done by such dog as aforesaid, the owner or keeper of such dog shall pay to the party aggrieved double the damage, to be recovered in manner aforesaid; and an order shall be made by the court before whom such second recovery shall be had, for killing such dog, which order shall be executed by the officer who shall be charged with the execution thereof; and it shall not be necessary, in order to sustain any such action, to prove that the owner or keeper of such dog knew that such dog was accustomed to do such damage."

At the common law an action of this character could not be maintained without proof that the defendant had such knowledge of the previous acts and character of the dog as would reasonably suggest to him the danger of permitting

him to remain at large.    One purpose, and possibly the main purpose, of this statute was to relieve plaintiffs from the burden of proving knowledge which was frequently difficult for them to do, their inability in that regard often resulting practically to a denial of justice.    We cannot, however, believe that this statute was designed to be limited to this one specific relief.    The language employed "or shall assault or bite or otherwise injure any person" seems to us to indicate that something more was intended.    We cannot pass over the words "otherwise injure any person" without attaching to them some meaning and some importance. We think that the plaintiff was "otherwise injured" through the behavior of the defendant's dog and that the statute before referred to is broad enough to sustain the plaintiff's action.

Inasmuch as it is apparent that all of the matters alleged in the plaintiff's declaration depend upon and must be supported by substantially the same testimony there should be a new trial upon both counts.

The defendant's exceptions are overruled, the plaintiff's exceptions are sustained, and the case is remitted to the Superior Court for a new trial upon both counts.

*Anthony V. Pettine,* for plaintiff.
*Antonio A. Capotosto,* for defendant.

---

MICHAEL SWEENEY *vs.* GEORGE H. BROW.

MARCH 19, 1913.

PRESENT:  Johnson, C. J., Parkhurst, Sweetland, Vincent, and Baker, JJ.

(1)  *Specific Performance.    Inadequacy of Price.    Auction Sale.*

Inadequacy of price, alone, is not sufficient to defeat a decree for specific performance.

(2)  *Specific Performance.    Memorandum.    Statute of Frauds.*

The day after an auction sale of real estate the auctioneer delivered to the purchaser the following memorandum (omitting the printed description of

the premises attached thereto, being part of the printed notice of sale): "July 14, 1911. Sold at public auction to X., land, buildings and all property described in above notice, of G. H. B., price, $9,800.00; credit by check, $980.00; balance due, $8,820.00. To be paid within 20 days on delivery of deed. L. S. Gray, agent and auctioneer":—

*Held,* that it was a sufficient memorandum under the statute of frauds to bind the owner to a conveyance of the property provided the auctioneer had authority to sign as agent when it was signed and delivered on July 15th.

*Held,* further, that the word "sold" would be interpreted to mean "agrees to sell."

*(3)   Memorandum.   Statute of Frauds.*

Unimportant variations in the description of premises in a memorandum of sale under the statute of frauds are not fatal.

*(4)   Auctions.   Agency.   Memorandum.*

In the sale of real estate a memorandum in writing being necessary to make it binding, the sale which the auctioneer is employed to make is not accomplished until such memorandum is executed.

*(5)   Auctions.   Agency.*

An auctioneer's authority as to the purchaser ceases as soon as the sale has taken place, but as to the seller it may continue after the sale being determined in each case by the scope and duration of his agency.

*(6)   Auctions.   Agency.   Memorandum.*

Where an auctioneer was employed two weeks before a sale and catalogued the personal property, advertised the entire property and made all arrangements and on the day personally conducted the sale and the following day delivered articles of personal property to purchasers and collected the moneys due therefor, he was the agent of the seller upon the day following the sale for the purpose of signing and delivering the memorandum of sale of the real estate to the purchaser thereof.

*(7)   Auctions.   Licenses.*

The fact that the auctioneer conducting the sale of real estate was not a licensed auctioneer of the town where he conducted the sale does not affect its validity.

BILL IN EQUITY for specific performance.   Heard on certification under Gen. Laws, 1909, cap. 289, § 35.

BAKER, J.   This cause, after hearing for final decree, was certified by the Superior Court in accordance with the provisions of Section 35, Chapter 289, General Laws, for the determination of the Supreme Court.

The suit was brought in the Superior Court for Newport County, August 11, 1911, for the specific performance of a contract for the sale of certain real estate described in the bill and situated in Tiverton in said county.

The amended bill alleges that the respondent caused the real estate described therein, in pursuance of a printed notice published in various newspapers in Rhode Island and Massachusetts prior to the time of sale, to be offered for sale at public auction in said Tiverton on July 14, 1911, by one Lewis S. Gray, auctioneer; that at said auction sale held pursuant to said notice the complainant became the purchaser of said premises for the sum of $9,800, he being the highest bidder therefor; that thereupon the complainant paid to said Gray, auctioneer as aforesaid, the sum of $980 in accordance with the terms of said sale as part payment of said purchase money and that at the time of payment on said 14th day of July, 1911, in said Tiverton, said Gray gave to the complainant a receipt in the following words and figures:

"FALL RIVER, MASS., July 14, 1911.

"Received from Mr. M. Sweeney nine hundred and eighty dollars, part payment on farm of $9,800.00.

"L. S. GRAY."

That on the following day, July 15, 1911, said Gray gave and delivered to the complainant the following memorandum of purchase and sale (omitting printed description of farm attached being part of printed notice of sale taken from a newspaper).

"JULY 14, 1911.

"Sold at public auction to M. Sweeney, land, buildings and all property described in above notice, of George H. Brow.

| | | |
|---|---|---|
| price | | $9,800.00 |
| by check | Credit | 980 00 |
| Balance due | | $8,820.00 |

"To be paid within 20 days on delivery of deed.

"L. S. GRAY, *Agent & Auctioneer.*"

That on the 25th day of July, 1911, complainant tendered in lawful money to said respondent the sum of $8,820, the balance due on said purchase price, and demanded a deed of said property and that said respondent refused to accept said tender or to deliver to said complainant a deed of said property and still refuses to convey the same.

The bill also charges the respondent with cutting the growing crops which were on the premises at the time of sale and prays that the respondent may be required to convey said real estate to the complainant in accordance with the terms of said sale and for an accounting of all rents and profits and for all crops cut and removed from said premises.

Respondent in his amended answer admits his ownership of the real estate in question and without admitting or denying the other allegations of the bill leaves the complainant to prove the same and further alleges that no agreement in writing for the purchase of said premises, or any part thereof nor any memorandum or note thereof in writing had been made, entered into or signed by him or any person thereunto by him lawfully authorized and claims the benefit of the statute of frauds.

He also answering says that he instructed Gray, prior to said alleged sale, to carry said property up to $11,000, but that Gray disregarded such instructions; and also that the price at which said Gray pretended to sell said real estate is not a reasonable and fair price.

To the answer a general replication was filed. By admission and evidence these facts are taken as established beyond question: namely, that the respondent on July 14, 1911, was the owner of said real estate; that said real estate was advertised for sale as alleged in the bill; that on said July 14th it was offered for sale at auction by said Gray as auctioneer; that $9,800 was bid therefor by the complainant, which was the highest bid made at said sale; that said real estate was knocked off to the complainant as purchaser and that thereupon he paid $980 to said auctioneer as part of the purchase money; that thereupon the receipt therefor

was given as set out in the bill; that on July 25, 1911, the complainant made a lawful tender to the respondent of $8,820, the balance due on said purchase price and demanded a deed of said real estate; that said respondent refused to accept said tender or to deliver to the complainant a deed thereof, and still refuses to convey the same. Said receipt was introduced in evidence and marked Exhibit B.

Twelve issues of fact were framed, settled and allowed. Broadly speaking the issues in controversy at the hearing may be grouped under two heads, viz.: First, was the alleged sale a fair one? Second, was any memorandum of sale in writing given by the respondent or by his agent duly authorized sufficient under the statute of frauds to bind him to its execution?

The issues under the first head are,—

"10. Was said alleged sale a fair sale?"

"11. Was the alleged purchase price a fair price for the premises described in paragraph one of said bill?" Three objections are made by the respondent under this head: First, that the auctioneer was instructed to sell for not less than $11,000; second, that the sale was conducted with undue haste and, third, that $9,800 was not an adequate price for the real estate.

Upon a careful consideration of all the testimony on these three points we conclude that as a matter of fact respondent did not instruct the auctioneer Gray to sell the real estate for not less than $11,000, or any other sum; that the auction was not conducted with undue haste; that the price for which the farm sold at the auction, which was well attended and at which no reservation as to price was stated, was not inadequate. If the price were inadequate, it is well settled that that alone would not be sufficient to defeat a decree for specific performance. 26 Am. & Eng. Ency. L. 26, 27. The court is of the opinion therefore that the sale was a fair one.

But was any memorandum of such sale in writing given by the respondent or by his agent duly authorized sufficient

under the statute of frauds to bind him to its execution? Under this head fall issues. "8. Did said auctioneer Lewis S. Gray give and deliver to the complainant a memorandum of said alleged premises on the 15th day of July, A. D. 1911?" "12. Was there an agreement in writing for the purchase of the premises described in paragraph one of said bill or any part thereof or any memorandum or note thereof in writing made and entered into and signed by the respondent or by any person thereunto by him lawfully authorized?" The evidence shows that in the auctioneer's book, McCartney, who was acting as clerk for Gray, made at the time of the sale the entry, "$9,800, Mr. Sweeney, M." The receipt given by Gildard in Gray's name, Exhibit B, is heretofore set out. Issue 7 is: "Was the alleged receipt annexed to a copy of the printed notice at the time of delivery?" Upon the evidence this question is answered in the negative. But the entry in the book and Exhibit B are both clearly insufficient to bind the respondent and the complainant is therefore compelled to rely on the memorandum alleged to have been given to him by Gray on July 15, 1911, which was introduced in evidence as Exhibit C. The respondent raises a question of fact in urging that Exhibit C was not made and delivered on July 15, 1911. No question is made as to said Exhibit C being a memorandum signed by Gray. The objection is in effect, if not in words, that said memorandum was not made and delivered until after a certain interview in Providence on July 24, 1911. Gray testifies that he signed and delivered Exhibit C at Mr. Ryan's office in Fall River in the afternoon of July 15, 1911. Sweeney says that he saw it in Ryan's office on Monday, July 17, 1911. This is all the direct testimony as to time of delivery. Taking into consideration all of the direct testimony on this point and also the probabilities of the case, we are of the opinion that it is established that Exhibit C was made and delivered on July (2) 15th. We are also of the opinion that said Exhibit C is a sufficient memorandum in writing under the statute of frauds to bind the respondent to a conveyance of the farm, pro-

vided that Lewis S. Gray had authority to sign as the agent of the respondent when the memorandum was signed and delivered on July 15th.  The memorandum states the names of the parties, the consideration, the subject matter of the contract, the promise of the vendor and the conditions of sale.  The word "sold" in the memorandum is to be inter-
(3) preted to mean, "agrees to sell."  See *Atwood* v. *Cobb*, 16 Pick. 227, and cases cited.  And the alleged errors and variations in description, if admitted, are unimportant and not fatal.  Bateman on Auctions, p. *56.

The respondent claims, however, that Gray was not his agent at the time the said memorandum was signed by him. On this point  no evidence was offered showing  that Gray had been specifically discharged as respondent's agent before July 24th.  The fact of Gray's having given on Saturday noon, July 15th, to Mrs. Brow, for delivery to her husband, certain checks in full settlement for all moneys received by him from the said auction sale, less his commission, affords no presumption of the termination of his agency, if there still remained anything to be done by him to render effectual the sale he was employed to make, as, for instance, the signing of a memorandum sufficient to clinch the sale.  That said checks included, less commission, the partial payment of ten per cent. on account of the purchase of the real estate is not without significance in this connection.  Ordinarily an agent's authority unless revoked continues in order to carry out and accomplish the thing he was employed to do. "Agency is of course created by the principal for a purpose and when this purpose is fully accomplished the agency
(4) *ipso facto* ends and the authority of the agent to bind the principal by further action ceases."  31 Cyc. 1292.  So that in the case of a sale of real estate a memorandum in writing being necessary to make it binding, the sale which the auctioneer is employed to make is not accomplished until such memorandum is executed.  But it is urged that Gray had no authority to sign and deliver the memorandum on the day after the sale on the ground that "the auctioneer's

authority ceases as soon as the sale has taken place." Respondent in support of this claim cites Bateman on Auctions, p. *28, note p., and the cases under said note p., namely, *Seton* v. *Slade*, 7 Ves. 265, 276; *Sykes* v. *Giles*, 5 M. & W. 645. The entire sentence in Bateman is—"The auctioneer's authority ceases as soon as the sale has taken place; and, therefore, after the sale, unless specifically empowered, he cannot rescind or vary the contract, or deal with the purchaser as to the terms upon which the title is to be made." In *Seton* v. *Slade*, a purchaser dealt with the auctioneer after a contract of sale in writing as to terms upon which title was to be made: *Held*, that the auctioneer was no longer the agent of the vendor; he was his agent only to sell, not to deal with the terms upon which a title was to be made. The auctioneer disclaimed authority in that respect and referred the purchaser to vendor. In *Sykes* v. *Giles* an auctioneer after sale attempted to vary the conditions of payment without authority from vendor: *Held*, as soon as the sale had taken place and the deposit money paid, authority of the auctioneer was at an end and he had no authority to make any contract for payment of the remainder. Both cases turned on the auctioneer's authority under their contracts of employment and not on their authority as auctioneers. The whole difficulty on this point seems to have arisen after the courts, somewhat reluctantly but nevertheless generally, held an auctioneer to be both the agent of the seller and the purchaser. He becomes the agent of the purchaser only upon the fall of the hammer and is such an agent only for the purpose of signing the memorandum required by the statute of frauds to bind the purchaser. This agency does not arise *ex virtute officii*, but is based upon the conduct of the purchaser ordinarily in bidding orally and thus authorizing the auctioneer to sign for him. And as agent of the purchaser he must sign at the time of sale. See *Smith* v. *Arnold*, 5 Mason, 414, 419. "It is, for instance, decided that the memorandum of the auctioneer to bind the purchaser must

be contemporaneous with the sale. It cannot be made afterwards." See, also, *Gill* v. *Bicknell*, 2 Cush. 355.

In many cases the textbook writers, and courts as well, have used language in a broad unguarded way as if the authority of an auctioneer as agent of the seller and purchaser were on the same footing and subject to the same limitations. This is so neither in reason nor by the weight of modern authority.

Browne on the Statute of Frauds, § 353 a. says: "The cases since *Buckmaster* v. *Harrop* (13 Ves. 456), appear to rest on the distinction between the auctioneer's agency for the seller and his agency for the buyer. The former they seem to concede (against the decision of that case), may continue so as to authorize the auctioneer to sign the memorandum at some time after the sale; but the latter, held it must be exercised at the time of the sale."

*Mews* v. *Carr*, 1 H. & N. 484 (38 E. L. & Eq. 358). "The auctioneer at the time of the sale is agent for both seller and buyer so as to bind them by his signature. At the moment the sale is over the same principle does not apply. The auctioneer is no longer the agent of both parties, but of the seller only, and the signature of the seller or his agent cannot bind the buyer."

In *Horton* v. *McCarty*, 53 Me. 394, 396, the court says: "There is a manifest distinction between the agency for the seller and that for the purchaser. The auctioneer is selected and appointed by the seller and the purchaser has no voice in the matter. He is undoubtedly the agent of the vendor from the inception to the final consummation of the contract and the full performance of its terms. His agency for the purchaser does not commence until the sale has been opened and he becomes the highest bidder."

See, also, *Schmidt* v. *Quinzel*, 55 N. J. Eq. 792. An auction sale of real estate was held July 24, 1895. A memorandum of sale was signed by the auctioneer July 25, 1895. In November, 1895, the auctioneer amended the memorandum by making certain additions thereto. The court says: "Con-

ceding that the auctioneer was at one time the agent of the
defendants to sign such memorandum or note and that his·
authority to sign for them, the vendors, was not confined to
the time of sale." . . . "yet his authority was actually
revoked by defendants before November and the fact of
revocation made known to the complainant."

See, also, *Walker* v. *Herring*, 21 Gratt. (Va.) 678.

In *White* v. *Dahlquist Mfg. Co.*, 179 Mass., page 427, it
appears that the deposit money was paid and the memoran-
dum of sale given on the day after the auction sale of real
estate.   The court, stating that an agent may during the
existence of his agency sign a memorandum subsequent to
the formation of the contract, further says, on page 432:
"It has been sometimes thought that there is an exception
to this rule in the case of auctioneers (see the authorities
referred to in Browne, St. of Frauds, § 353), but the excep-
tion is more apparent than real.   The question does not turn
upon the fact that the agent is an auctioneer, but upon the
scope and duration of the agency.   While it is said that an
auctioneer is the agent of both seller and purchaser for
signing the contract, it does not follow that his agency for
the one is co-extensive in its nature with that for the other.
The word 'auctioneer' is sometimes used to designate the
crier who simply calls for bids and strikes the bargain at an
auction sale.   His connection with the sale may begin with
calling for bids and end by striking the bargain.   If that
be the only authority given him by the seller and purchaser,
it may be said that while the power to strike the bargain
fairly imports authority to make his work effectual by
signing the memorandum necessary to bind the parties, it
also implies that that act shall be substantially contempo-
raneous with the sale and as a part of it." . . . "But
primarily and actively the auctioneer as a rule is the agent
of the seller, and as to him his authority is generally more
extensive, and may cover a time both before and after the
sale.   Frequently the property is put into his hands for sale,
and all the details are left entirely to him.   He is expected

to make all the arrangements by way of public advertisement and otherwise, and to act fully at the sale, to receive the deposit from the purchaser and to carry the transaction to the end. Such authority from a seller to an auctioneer does not end with the auction sale but extends beyond it, and until it is revoked the auctioneer may properly bind the seller by a memorandum signed within a reasonable time." The signing of the memorandum the day after the sale by the auctioneer was held to be within the scope of his employment.

The sentence quoted from Bateman, *supra*, appears and is approved as a correct statement of the law in *McKiernan* v. *Valleau*, 23 R. I. 507. In that case the court expressly finds that upon the evidence the authority of the auctioneer terminated ten days after the auction sale. There is nothing decided in that case which is not in harmony with the law as stated in the foregoing cited cases and authorities. Respecting the termination of an auctioneer's authority it would seem, however, to be more accurate to state the law as follows: The auctioneer's authority as to the purchaser ceases as soon as the sale has taken place; but as to the seller, it may continue after the sale, being determined in each case by the scope and duration of his agency.

*Sheffield & Harvey, Charles P. Ryan,* for complainant.
*Waterman & Greenlaw,* for respondent; *Charles E. Tilley,* of counsel.