CHARLES C. WILBUR *vs.* CHALLONER C. GROSS.

JANUARY 20, 1936.

PRESENT: Flynn, C. J., Moss, Capotosto, and Baker, JJ.

Moss, J. This is an action of trespass for injuries sustained by the plaintiff when bitten by a dog harbored by the defendant. There was no proof of scienter and on that ground the defendant, at the close of the testimony, made a motion that a verdict be directed in his favor. This motion was denied by the trial court and his exception noted. The jury returned a verdict of $1,000 in favor of the plaintiff. The defendant thereafter duly moved for a new trial on the grounds that the verdict was against the law, that it was against the evidence, and that the damages were excessive. The trial justice sustained the verdict as to liability, but held all damages above $600 to be excessive. The plaintiff filed a remittitur accordingly and the defendant's motion for a new trial was therefore denied. The defendant excepted to this decision and the case is before us on his exceptions to these rulings.

The defendant was the owner of a farm in the town of Glocester that was entirely enclosed by stone walls and other visible and tangible obstructions, except that there was an opening of the ordinary width, for a driveway that ran from the highway and past the house to a garage. On these premises the defendant had a dog, claimed to be totally blind, which was kept chained to a doghouse back of the garage. There was a passageway between the garage and the barn, which led to an orchard. The plaintiff called at the farm at the defendant's invitation to get some apples. At the back door of the house he inquired for the defendant and was directed to go through the barn to the orchard, where the defendant then was. Instead of going as directed, he used the passageway between the barn and the garage and was there bitten by the dog.

The plaintiff contended at the trial, and in his brief and argument before us, that he did not have to prove scienter, as required at common law, because of the provisions of general laws 1923, chapter 136, section 3. Omitting a small irrelevant part, this section is as follows: "If any dog shall kill, wound or worry, or assist in killing, wounding or worrying, any sheep, lamb, cattle, horse, hog, swine, fowl, or other domestic animal, belonging to or in the possession of any person, or shall assault or bite, or otherwise injure, any person while travelling the highway or out of the enclosure of the owner or keeper of such dog, the owner or keeper of such dog shall be liable to the person aggrieved as aforesaid, . . . and it shall not be necessary, in order to sustain any such action, to prove that the owner or keeper of such dog knew that such dog was accustomed to do such damage."

Specifically, the plaintiff contended and the trial justice ruled that since the defendant's premises, within which the dog injured the plaintiff, were not completely surrounded by tangible obstructions, but had the above-described opening into them, the dog, when it bit the plaintiff, was "out of the enclosure" of the defendant, within the meaning of

the above section, and that therefore proof of scienter was not necessary. Clearly the decision of the case depends wholly on the intent and meaning of the pertinent part of this section and particularly on the proper construction of the word "enclosure" as used therein.

This section has been involved in many cases which have been decided by this court, and in several of them there have been statements of the meaning of the word "enclosure," but according to our analysis of those cases, these statements have been rather incidental and not vital to the determination of the cases in which they have been made, except in *Whittet* v. *Bertsch*, 39 R. I. 31, which will be fully discussed *infra*. In none of the opinions in those cases has there been any careful consideration of the precise meaning of the word "enclosure," as used in this section, in the light of the context and the intent and purpose of the statute, probably because no such consideration has seemed necessary for the decision of any case that has previously come before this court. We do not find that the meaning of this word has ever been clearly determined with reference to the decisive issue in the instant case. We therefore feel it to be our duty to consider and discuss it fully at this time.

In construing a statute it is well settled that "when the language is not precise and clear, such construction will be adopted as shall appear most reasonable, and best suited to accomplish the objects of the statute, and that a construction which leads to an absurdity will be avoided if possible." *State* v. *Drowne*, 20 R. I. 302, 306. In *re State House Commission*, 19 R. I. 326, 331, the court says: "The intention of the makers of a statute is sometimes to be collected from the cause or necessity of making a statute, and at other times from the circumstances," and in *Dawley* v. *Probate Court*, 16 R. I. 694, 696, the court, in speaking of the interpretation of statutes, says: "The real intention, it is said, should always prevail over the literal sense of terms, and the real intention is to be ascertained from an examination of the whole and every part of a statute, taken

and compared together." *Racine* v. *Tenth District Court,* 39 R. I. 475; *Morgan* v. *Allen,* 51 R. I. 228.

The part of section 3 that concerns damage by dogs to domestic animals goes back at least to public laws of Rhode Island, revision of 1798, where substantially the same provision is found on page 538 under the heading: "An Act to prevent Sheep and Cattle from being worried and torn by Dogs." The provision appears in the revisions of 1822; 1844, page 362, sec. 3; and 1857, chap. 82. Public Laws 1860, chap. 326, amends Revised Statutes 1857, chap. 82, by adding certain other provisions which appear in the chapter on dogs in the revisions from 1872 down to the present time. One of these additions of 1860 was the predecessor of section 6 of chapter 136 of our general laws of 1923, and deserves consideration in determining the question now at issue.

The pertinent part of that section and of its predecessors reads as follows: "Any person may kill any dog that may suddenly assault him or any person of his family or in his company, while the person so assaulted is out of the enclosure of the owner or keeper of such dog." From this language it seems clear to us that it was the intent of this section that if any person is to have the right to kill a dog which may assault him, he must keep out of the enclosure of the owner or keeper of the dog and that if such person enters inside the enclosure of another person, he loses the right to kill a dog kept there, if he is suddenly assaulted, while inside the enclosure, by such dog. The condition, as stated in this section, is the position of the person assaulted and not of the dog.

In our view, then, the important thing under this section is that there be something to give a man reasonable notice that he is entering upon occupied premises, where there may be a dog. There would be such notice if such premises are set apart from adjoining property by boundaries sufficiently apparent to indicate the approximate limits of occupation. If the word "enclosure" can be reasonably

construed to mean occupied premises thus set apart, it is our conclusion that it should be given that meaning in this section. We know of nothing in our statutes which makes this meaning unreasonable, and cases will be cited and discussed later in this opinion which to our minds show that this is a proper meaning.

Section 3, in substantially the same form as at present, was enacted by P. L. 1889, chap. 749. Until then it was confined to damage done by dogs to domestic animals, and the language with regard to the recovery of damages for personal injuries inflicted by a dog was then added. Most of this language, including "out of the enclosure of the owner or keeper of such dog," is the same as language in section 6, above quoted and discussed. Section 3, then, should be construed as harmoniously as possible with section 6. The former says: "If any dog . . . shall assault or bite, or otherwise injure any person while traveling the highway or out of the enclosure of the owner or keeper of such dog," *etc.* Here the word "traveling" would naturally refer to a person rather than to a dog, and for that reason, and because in section 6 "out of the enclosure" *etc.*, clearly applies to the person, and because of the order of the words in section 3, we are convinced that in this section the clause "while traveling the highway or out of the enclosure of the owner or keeper of such dog" modifies the word "person" and not the word "dog."

The case of *Swift* v. *Applebone*, 23 Mich. 252, was brought on a statute almost wholly the same as ours, and all the part of our statute which is involved in the instant case may have been taken verbatim from this earlier Michigan statute. In his charge to the jury in that case the trial justice showed clearly that he construed the clause in question, there and here, as modifying "person" and not "dog," and this was not criticised by the supreme court. The meaning of the word "enclosure," so far as we have been able to ascertain, was in no way involved in that case or in any other Michigan case, or in any other dog biting case outside of Rhode Island.

Since our sections 3 and 6 are so similar in all that helps in the construction of the word "enclosure," we are convinced that the meaning of section 3 is that any person who wishes to be able to recover for his injuries, without proof of scienter, if he should be assaulted by a dog, must keep out of the enclosure of the owner or keeper of such dog; and that the word "enclosure" in this section has the same meaning, if reasonable, as we have found it to have in section 6. The location of the injured party at the time of the act complained of and not the means adopted by the owner or keeper of the dog to prevent it from leaving the occupied premises is the determining factor in this class of cases. Where a dog injures a person, absolute liability under the statute exists, if the person so injured is then traveling the highway or is then outside the apparent boundaries of the premises occupied by the owner or keeper of the dog, but when such person enters such premises, with reasonable notice that he is doing so, the liability becomes conditional on scienter.

To give him reasonable notice of the location of such boundaries it is not required that there be no open interval in the boundary lines, provided that it is reasonably clear, from the adjacent visible boundaries, approximately where the boundary line runs across the interval. If such an interval in the boundary lines of a tract of land would prevent the tract from being an "enclosure," then a tract with a level driveway into it, but entirely enclosed elsewhere, would be an enclosure, if there is a gate across the driveway but not otherwise. To hold that premises must be enclosed by tangible obstructions seems to us entirely unreasonable, especially in view of the fact that it is well established that to be an "enclosure" a piece of land need not be surrounded by barriers of a sort to keep dogs in, if they wish to go through them, and in view of the fact that the degree of care exercised by the owner to keep his dog inside his premises has no bearing on the question of his legal liability. To make the owner's liability, for injuries inflicted by his

dog on a person who has come upon the owner's premises, contingent or absolute according to whether the premises are or are not entirely surrounded by *tangible* obstructions, without regard to whether or not the obstructions are such as to tend to prevent the dog from injuring persons, seems to us unreasonable and arbitrary. The language of the section in question should not be construed so as to produce such a result, if there is another reasonable construction which will avoid it. The construction which we have concluded to be the proper one, if reasonable, would make the nature of the owner's liability dependent upon whether or not the injured man did or did not have reasonable notice that he was entering within the boundaries of occupied land, where a dog might be kept by the occupant. This is a logical and not an unreasonable and arbitrary distinction.

In previous cases in this court under section 3, it has heretofore been treated as a distinct enactment and without reference to its immediate context or to other provisions in the same statute which might assist in determining its real intent. In one respect it has often received a construction which we have above held to be incorrect. All the later cases in which the section was involved have seemed to proceed on the assumption that the words "out of the enclosure of the owner or keeper of such dog" refer to the word "dog" rather than to the word "person." This assumption has naturally led to the view that the intent of this part of the section was to penalize the owner or keeper of a dog for not keeping it *inside* the premises by some restraining obstructions around them, by depriving such owner or keeper of the defense of want of proof of scienter.

This incorrect assumption and the incorrect view which resulted are well illustrated in the two most recent cases in this court prior to the instant case, namely *Kogut* v. *Pytel*, 46 R. I. 378, and *Pritsker* v. *Greenwood*, 47 R. I. 384. In the former case this court describes it as "an action of trespass on the case to recover damages caused by the defendant's dog biting the plaintiff while the dog was out

of the defendant's enclosure." In the latter of the two cases the court says at page 386: "The owner or keeper of a dog must keep the dog within an enclosure or suffer the consequences; that is, pay for any damage caused by the dog." Neither of these cases, however, involves any construction of the word "enclosure" as used in the statute in question.

A construction of this word as so used, and perhaps a construction of the section that treats the clause "while . . . out of the enclosure" *etc.*, as referring to the dog, seems to have first appeared in *Peck* v. *Williams*, 24 R. I. 583, in which the plaintiff had been injured by a dog, when it was in its owner's cart on a highway and the plaintiff was trying to climb into the cart. There this court says at page 586: "If it be claimed that, under the facts set up in the plea, the dog, being in the defendant's cart at the time the plaintiff was attacked by him, was not 'out of the enclosure of the owner,' within the meaning of the statute, we reply that we do not feel warranted in construing the term 'enclosure' as including the cart of the defendant when on the highway. The word 'enclosure,' in its ordinary legal signification, imports land inclosed with something more than the imaginary boundary line; that is, by some visible or tangible obstruction, such as a fence, hedge, ditch, or an equivalent object for the protection of the premises against encroachment."

The only serious criticism that we make of this definition, as applied in the construction of the section in question is the use of the word "obstruction." If the boundary line is not "imaginary" but is "visible," *i. e.*, reasonably apparent to the sight, it need not be tangible and it need not constitute an obstruction. The last part of the quotation indicates that the function of the boundary line, for the purposes of this section, is not to keep the dog *inside* the occupied premises but to keep persons *outside*, unless they are willing to assume the risk of being injured, while on the occupied premises, by a dog which is there kept and which the occupant reasonably believes to be gentle.

It should be noticed also that on the same page, this court says: "As the statute thus enlarges the common-law liability of the owner or keeper of the dog so as to include damages sustained by his misconduct by any person while traveling on the highway or while out of the enclosure of the owner or keeper of the dog, whether the dog is vicious or not, we are of the opinion that the mere technical trespass set up in the special plea aforesaid is not a bar to the action." This language indicates to us that the court then took the same view of the section that we take now, namely, that by the way in which the section is worded the plaintiff's right to recover without proof of scienter is made to depend upon whether at the time of the injury he had stayed out of the enclosure of the defendant and not upon whether the dog had left it. The nature of the boundary line about the enclosure was not in the slightest degree involved in the case. The only reason why the court set out the definition above quoted was evidently to show that "enclosure" in the statute meant land and could not mean a cart.

The definition above quoted was taken almost verbatim from page 331 in the opinion in *Porter* v. *Aldrich*, 39 Vt. 326, (1866), which is cited in the *Peck* case as authority for that definition. The first difference is that in the Vermont opinion the court, after discussing previous statutes in that state, says, at page 331: "The word '*enclosure*' therefore imports" *etc.*, and not "The word 'enclosure,' in its ordinary legal signification, imports" *etc.*, as the language above quoted from the *Peck* case reads. The only other difference is that the end of the statement in the Vermont opinion reads: "for the protection of the premises against encroachment by cattle," while these last two words are omitted in the opinion in the *Peck* case.

The Vermont case dealt with a different statute, one which gave a person a right to "impound any beast found in his *enclosure* doing damage." A careful reading of the whole opinion in that case shows clearly that what the court says on page 331, as to the import of the word "enclosure," is

not as to its import in the statute involved in the case then before the court, nor as to its *ordinary* import, but as to its import *in an earlier statute,* section 16 of the Revised Statutes. That also was about impounding cattle doing damage in an enclosure. It required that the fence around the enclosure must be a "legal and sufficient fence," as defined in another statute, and was in force up to 1853.

At the top of page 332 the Vermont court says: "But the act of 1853 regulating the subject of fences, in terms repeals section 16 of the Revised Statutes, above mentioned, and that section is not contained in the General Statutes under which the question in this case arises. It is insisted on the part of the defendant that however it might have been under the former law, that since the repeal of section 16 of the Revised Statutes, and under the present law on the subject of fences, the rule is different; that under the former statutes the owner or occupant of land was bound to fence his neighbor's cattle out, but that under the present laws the owner or keeper of cattle is bound to fence them in, and that if he suffers them to stray off his own land on the land of others, it is a trespass, and the cattle may be lawfully impounded. This is true so far as relates to occupied land, except as to division fences."

The court then quotes a statute which says, for certain purposes, that "*occupied land* bordering upon highways shall be deemed to be the enclosure of the owner or occupant . . ." The court continues, "thus indicating that only occupied land is deemed an enclosure. There is no apparent reason why the word '*enclosure*' in section 4 of chapter 100, giving the right to impound, should not be understood in the same sense."

The court holds that it was not sufficient for the defendant in his plea to use the word "close" to describe the *locus in quo,* and closes the opinion as follows, on page 335: "But as the objection (is) that the pleas do not allege the *locus in quo* to have been an *enclosure,* or *occupied* or *improved* land, and as this objection applies to all the

special pleas, the judgment of the county court is reversed, and the pleas adjudged insufficient, and the cause remanded with leave to the defendant to replead on the usual terms as to costs."

It is clear, then, that the court in that case was of the opinion that all which was required, under the then existing statute as to impounding cattle damage feasant, to make the *locus in quo* an "enclosure," within the meaning of that word in the statute, was that it be *occupied* land. *It did not have to be fenced.*

A similar meaning is given to the word in *Keith* v. *Bradford*, 39 Vt. 34, a case under the same statute. It is clear, from the upper part of page 40 and earlier in the report of the case, that the defendant's field where the damage was done was cultivated and was not separated by a fence or anything of the sort from some open and uncultivated land of his neighbor next north, lying between the defendant's field and the land of the plaintiff still further north, where the cattle, which did the damage and were therefore impounded by the defendant, had been kept. The court says that the defendant and his neighbor next north may have agreed that there be no line fence between their lands.

At page 40 the court says: "In 1853 the statute, prescribing the rights, duties and liabilities of land owners as to fences and occupation, changed the law requiring the land owner to fence himself in against his neighbor's cattle, and required the owner of the cattle to fence them in against doing damage to his neighbor." At page 41 the court says: "We think . . . when a land owner has done upon and around his own land, by way of fence and improvement and occupancy, all that the law requires in order, under the same law, to cast the duty on others to keep their cattle off from his land, that such land, in the sense of the word as used in the statute giving the right to impound, is the *enclosure* of the owner."

The court held that, if the absence of a fence between the defendant's cultivated land and his neighbor's uncultivated

land next north was not a breach of his duty to such neighbor, the absence of such fence would not prevent the defendant from having the right to impound the plaintiff's cattle damage feasant, since the absence of such fence would not then prevent the defendant's land from being his "enclosure" within the meaning of the statute.

In *Dudley* v. *McKenzie*, 54 Vt. 685, (1882), a similar case of replevin for cattle impounded under the same statute, the sole question at issue was whether cattle could be impounded when no actual *damage* was committed by them in the defendant's enclosure, and the court held that they could not, because the statute provided that "a person may impound a beast found in his enclosure doing damage." The question of what constituted an "enclosure" within the meaning of the statute was not in any way involved and the court cites *Porter* v. *Aldrich, supra,* simply as indicating "an intention on the part of the court to construe the statute strictly, and to give full effect to the language in which it is couched." The court in *Dudley* v. *McKenzie, supra,* says that in the earlier case the court "held that the word 'enclosure', as used in the statute imports more than the word *close,* which embraces land owned or rightfully possessed by a party, although inclosed only by the imaginary boundary line that defines its territorial limits, but signifies land inclosed with some visible and tangible obstruction, such as a fence, hedge, ditch, or their equivalent, for the protection of the premises against cattle; and that it was not intended to extend this summary remedy to beasts *damage feasant* on wild, uncultivated, unimproved and unoccupied lands lying open and common."

In the first and last parts of this passage the court correctly states the ruling of the court in the earlier case. But in writing the middle part it overlooked the fact, noted *supra,* that the language there given was a statement in the earlier case with reference to the meaning of "enclosure" as used in an earlier and different statute, which was in force when the law as to fencing land was very different. It also over-

looked the fact that in that earlier case the court held that "enclosure" in the later statute, then in force, meant "occupied or improved land."

In *Davis* v. *Mudgett*, 81 Vt. 252, (1908), the court made no such mistakes. The facts were very similar to those in the earlier Vermont case of *Keith* v. *Bradford, supra*, the *locus in quo* being cultivated land of the defendant, on which grain and vegetables were then growing and which was not adjacent to the plaintiff's land. The statute as to impounding was the same as in the earlier Vermont cases discussed *supra*, and at page 254, the court says: "The statute also is that 'a person may impound a beast found in his enclosure doing damage,' P. S. 5564. The word 'enclosure,' as here used, means, not that the land is fenced, but only that it is occupied. *Porter* v. *Aldrich*, 39 Vt. 326; *Keith* v. *Bradford, Ib.* 34. And this is all that the word means as used in the avowry."

The weight to be given now to the definition of "enclosure" in the opinion in *Peck* v. *Williams*, 24 R. I. 583, *supra*, is much lessened by the fact that it was so largely based on a mistake as to what was the decision in *Porter* v. *Aldrich, supra*, and that *Keith* v. *Bradford, supra*, was apparently overlooked. Likewise the effect of the repetition of that definition in the opinion of this court in *Whittet* v. *Bertsch, supra*, to be discussed *infra*, is much lessened because that opinion relied upon *Dudley* v. *McKenzie, supra*, which had been overruled by *Davis* v. *Mudgett, supra*.

The case of *Oldham* v. *Hussey*, 27 R. I. 366, (1905), simply held that by section 5 of the same statute, "On Dogs," the keeper or harborer of a dog was made subject to the same liability as was imposed on the owner of a dog by section 3 and did not impose "a liability for acts of the dog committed within the enclosure of the owner or keeper of such dog beyond his common-law liability."

In *Palmer* v. *Saccocia*, 33 R. I. 476, (1912), a dog chained inside the defendant's premises had been released by his son and allowed to go on the highway without the defend-

ant's permission, and there attacked and injured the plaintiff. At page 477, the court in an opinion by SWEET-LAND, J., says: "It does not appear that the plaintiff at any time had been within the enclosure of the defendant." At page 478 is says: "The liability of the defendant is not at all conditioned upon his negligence or fault in permitting or enabling the dog to leave his premises. The statute intends to place upon the person who owns, keeps or harbors a dog the liability for injury which said dog may inflict outside of that person's enclosure." In this opinion the court seems to use the word "premises" as synonymous with the word "enclosure" as used in the statute and does not indicate that the latter word has any narrower meaning in the statute.

The case which seems to give the most support to the decision of the trial justice in denying the defendant's motion for a direction of a verdict in the instant case is *Whittet* v. *Bertsch*, 39 R. I. 31, (1916), *supra*. That was an action brought by a little girl to recover under the section involved in the instant case, and there was conflicting testimony as to whether she was bitten by the defendant's dog and, if she was, whether it happened on or outside of the defendant's premises, which were an open lot, with some buildings on it. There was no fence or other protection between the place on his lot where the defendant claimed that the plaintiff received her injuries and the adjoining open land beyond the boundary line on that side of the lot. Apparently there was nothing to mark the defendant's line of occupation or to inform the plaintiff that she was entering his premises, if she did enter them.

Under these circumstances the trial justice charged the jury that "the question in this case is simply whether the dog bit the little girl, regardless of whether it was on the open lot, or whether it was on this man's land." A little later he added: "A man in this state keeps a dog at his peril, unless he keeps him in an enclosure. An enclosure . . . is land which is surrounded by some sort of a fence

or hedge, or something of that kind." This court sustained this charge, quoting, as the definition of "enclosure," the language above quoted from the opinion in *Peck* v. *Williams, supra,* and cited, as supporting this, *Dudley* v. *McKenzie, supra; Appeal of Hall,* 112 Pa. St. 42; *Smith* v. *Williams,* 2 Mont. 195; *Miller* v. *Chicago & N. W. R. Co.,* 133 Wis. 183; *Tapsell* v. *Crosskey,* 7 M. & W. 441; 22 Cyc. 62.

The first of these cases cited we have already discussed and have shown that the definition of "enclosure" stated in the *Whittet* case is not in accordance with Vermont law. The decision in *Appeal of Hall, supra,* simply held that a direction in a will, that the executors shall inclose with an iron fence a certain tract, requires them to put a fence all around its boundary, unless a part of the boundary is occupied by some natural object or some artificial erection, *e. g.,* a house, which renders a fence impracticable or unnecessary. *Smith* v. *Williams, supra,* was an action to recover damages under a statute which provided that if an animal "shall break into any ground inclosed by a lawful fence, the owner or manager of such animal shall be liable to the owner of such inclosed premises for all damages sustained by such trespass." It is held that in order to recover under this statute the plaintiff's land must be entirely surrounded by a lawful fence or some obstruction equivalent thereto. This case was decided in an early day in Montana, when it was lawful for cattle to roam at large and a landowner who wanted to be protected against them must fence them out by fences complying with certain requirements, just as was the law in Vermont before 1853.

*Miller* v. *Chicago & N. W. R. Co., supra,* was an action by an owner of land, through which the defendant operated a railroad, to recover penalties amounting to over $21,000 under a statute which required any company which operated a railroad through a man's "inclosed lands" to construct suitable farm crossings, under a penalty of ten dollars, payable to the owner of such land, for each trip made by any of its engines through such land. The court holds

first that this was a punitive statute and must be construed as favorably to the railroad company as it reasonably could be. It then says, properly enough, "that the term 'inclosure' commonly means a particular space surrounded by a barrier of some sort," and that the term "inclosed land" should be construed accordingly. It should be noticed that the contention of the defendant was only, as the court states it at page 193, that the plain, ordinary meaning of the term "inclosed land," as used in the statute, is land so separated from all other land as to render the same suitable for use by itself.

*Tapsell* v. *Crosskey, supra,* involved the construction of a statute authorizing road surveyors to take materials on certain terms from "inclosed land" and it is held that a tract of land bounded partly by a hedge and ditch, partly by banks or ridges and partly by humps of earth, and partly without any visible boundary is not inclosed land within the meaning of the statute. This meaning is arrived at by consideration of the statute as a whole and comparison with an earlier statute on the same subject.

These cases and the others that we have found which construe the word "enclosure" show that it has no definite and fixed meaning but must be construed in the light of the context, the general intent of the statute in which it is used, any other relevant statute and any other matters assisting in its construction. See also *Golconda Cattle Co.* v. *United States,* 201 F. 281; *United States* v. *One Graham Bros. Truck,* 39 F. (2d) 141. The former of these cases, decided by the circuit court of appeals of the ninth circuit in 1912, involved the construction of a statute forbidding the inclosure of public land, if there would be included within the inclosure any land to which the person making the inclosure has no. claim or color of title made or acquired in good faith. It is held that the statute, in view of the conditions which led to its enactment, should receive a construction which will give effect to its broad purpose. It is held also that the word "inclosure" as used therein cannot be restricted in

meaning to a complete encircling of the land with a fence without openings, but applies to any means whereby there is effected a practical separation of any public land from the general body of such land.

The latter of the cases just cited, decided in 1930, involved the forfeiture of a truck under a statute which provided that every still or distillery apparatus, which the person having it in his possession or custody or under his control had not registered in accordance with certain requirements, "together with all personal property in the possession or custody, or under the control of such person, and found in the building, or in any yard or inclosure connected with the building in which the same may be set up, shall be forfeited." The truck involved in the case, when seized, was standing in the driveway which was a part of the premises used in connection with the illicit manufacture of liquor. The driveway led to the garage and was completely inclosed on three sides and had the usual open entrance from the street on the other side. It is held, at page 142, that the driveway was sufficiently inclosed to be an "inclosure" within the meaning of the statute. It may be here noted that in Webster's New International Dictionary the words "yard" and "inclosure" are given as synonymous. Evidently the court regarded the street or sidewalk line as a sufficiently apparent boundary on the front of the space in question, and the case therefore supports the proposition that an "enclosure" need not be surrounded by tangible obstructions.

The cases above discussed make it clear to our minds that the word "enclosure" may reasonably be given, in the statutory provision upon which the instant case is based, the meaning which, as we have above stated, would in our opinion be most in keeping with the evident intent and purpose of the statute, namely, occupied premises set apart from adjoining property by boundaries sufficiently apparent to indicate the approximate limits of occupation.

In the instant case the evidence proved beyond a reasonable doubt, and indeed it was admitted by the plaintiff's counsel, that the defendant's occupied premises, within which the plaintiff was when injured by the dog, were completely surrounded by visible and tangible obstructions except that there was, at or a little back from the highway line, an opening between the end of a boundary stone wall on one side and the end of a boundary steep bank on the other side. This opening was the usual size for a driveway and through it ran the driveway into the plaintiff's occupied premises. To the plaintiff, who entered through this opening, it must have been clearly apparent, from the wall and the bank, approximately where the occupation boundary ran across the opening between them, and that he was entering occupied premises, where a dog might be kept.

Therefore it is clear to our minds that this opening did not prevent these premises from being the "enclosure" of the defendant within the meaning of the statutory provision relied on by the plaintiff. We find that they were the defendant's "enclosure" within such meaning and that the plaintiff was required to prove scienter. No such proof was offered.

In view of some of the language used by this court in previous cases, it is easy to understand why the trial justice refused to direct a verdict for the defendant in this case. We, however, for the reasons above stated, are convinced that the defendant was entitled to have such a verdict directed. As this is decisive of the whole case, it is not necessary or advisable to consider any exceptions to other rulings.

The defendant's exception to the refusal of the trial justice to direct a verdict in his favor is sustained. The plaintiff may, if he shall see fit, appear before this court on January 29, 1936, and show cause, if any he has, why the case should not be remitted to the superior court with direction to enter judgment for the defendant.

*Fred Israel*, for plaintiff.
*Wilson, Lovejoy, Budlong & Clough*, for defendant.