391 A.2d 75.

BRENDAN BERNHART, *p.p.a.* EDWARD J. BERNHART *v.* MELVIN E. NINE.

AUGUST 16, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

KELLEHER, J.   This is a dog-bite case. The dog's name is Tiny.[1] Tiny's victim was 3-year-old Brendan Bernhart. Brendan's dad has brought a suit in his behalf and in behalf of Brendan against Tiny's master, Melvin E, Nine. A Superior Court jury returned a vertict for Mr. Nine. At issue in this appeal is the applicability of G.L. 1956 (1976 Reenactment) §4-13-16, which, in its pertinent part, makes an owner or keeper absolutely liable if his dog "shall assault, bite or otherwise injure any person" while that person is "traveling the highway or out of the enclosure of the owner or keeper of such dog." Since the crucial issue is whether Brendan was in or out the Nine enclosure at the time he was bitten, we shall first describe the locale where this incident occurred, then refer to the evidence describing the events that led up to the bite, and finally review past pronouncements of this court regarding what constitutes an "enclosure" for the purposes of our dog-bite statute.

The litigants are neighbors. In the spring of 1973 the Nine family lived in Portsmouth at 25 Valhalla Drive. The Bernhart home was located on the other side of the street, just three houses down from the Nine residence. Mr. Nine described the area as a quiet neighborhood where children at play were free to roam from yard to yard along the street without encountering such bothersome obstructions as hedges, walls, or fences.

The photographs in evidence show that the Nine family reside in a ranch-house-style bungalow of modest size. An asphalt driveway runs from the street alongside the residence

---

[1] Tiny is part golden Labrador retriever and part beagle. In size, he is described as being more Labrador than beagle and measures 2 feet in height and 2 feet in length.

to a point just even with the rear of a wooden staircase which affords access to the kitchen door. Shrubs grow in front of the house, and while there are no sidewalks, curbing runs along the street. The staircase consists of four steps and a landing which is just outside the kitchen door. The back of the staircase is open-ended. A wrought-iron railing runs along the outer edge of the staircase. The only fence in place during April 1973 ran along the line which separated the Nine property from that of the neighbors to their rear.

At the time of trial Mrs. Nine had died. Admitted into evidence was an April 19, 1973, statement given by her to an investigator. Mrs. Nine reported that at noontime on April 7, 1973, her 9-year-old daughter Lisa took several bones from the house out into the backyard and gave them to Tiny. Tiny took the bones and brought them to his favorite munching spot, which was the area directly beneath the back stairs. Lisa then went to play with her girl friends next door. Within a matter of minutes Mrs. Nine heard a scream. When she rushed out to the landing at the kitchen door, she saw Brendan moving away from the stairway, his face bleeding. Lisa called the rescue squad, and Brendan was taken to the Newport Naval Hospital. When Mrs. Nine met Brendan's parents, she told them that Brendan had dropped in to visit Tiny in his hideaway.

Mr. Nine testified that Tiny was usually tied up with a chain that measured some 12 to 15 feet in length to that portion of the wrought-iron railing that is secured to the bottom step of the back stairs.

The father's appeal is restricted to the charge given by the trial justice. Before delving into this area, it is fitting that we recall that at common law an action for personal injuries arising from a dog's attack could not be successful without proof that the owner had such knowledge of his dog's previous acts and character as would reasonably suggest to him the danger of permitting the animal to remain at large. *Malafronte* v. *Miloni*, 35 R.I. 225, 86 A. 146 (1913). Today

our dog-bite statute, which remains in substantially the same form as it was when first enacted in 1889, makes the dog's owner or keeper absolutely liable without proof of prior knowledge of the dog's dangerous propensities upon a showing of either one of the statutory contitions, i.e., (1) that the person was injured while traveling along the highway or (2) that the injury occurred outside the enclosure.

In his appeal Brendan's father claims that the trial justice erred when he denied the father's request for the jury to be instructed that "enclosure" means land which is enclosed by some visible or tangible obstruction such as a fence, hedge, ditch, or some equivalent object which protects the premises against encroachment. The father's request was based upon a 1916 ruling made by this court in *Whittet* v. *Bertsch,* 39 R.I. 31, 97 A. 18 (1916).

Ada Whittet had been bitten by Christian Bertsch's dog while Ada was playing with one of Bertsch's children on an open lot "near to or adjoining the defendant's premises." Mr. Bertsch had taken exception to the trial justice's instructions when he told the jury: " 'A man in this state keeps a dog at his peril, unless he keeps him in an enclosure. An enclosure * * * is land which is surrounded by some sort of fence or hedge, or something of that kind.' " The jury returned a verdict for Ada.

The *Whittet* court, in upholding the charge given by the trial justice, referred to the case of *Peck* v. *Williams,* 24 R.I. 583, 54 A. 381 (1903), where it was said: "The word 'enclosure,' in its ordinary legal signification, imports land enclosed with something more than the imaginary boundary line; that is, by some visible or tangible obstruction, such as a fence, hedge, ditch, or an equivalent object for the protection of the premises against encroachment." 24 R.I. at 586, 54 A. at 382. The *Whittet* court also cited cases from four other jurisdictions which allegedly supported the *Peck* definition of "enclosure."

In denying Mr. Bernhart's request, the trial justice relied

upon another case which came 20 years later, *Wilbur* v. *Gross*, 55 R.I. 473, 182 A. 597 (1936), in which this court took another and, what might be called, a longer look at the word "enclosure." Challoner C. Gross, the dog's owner, lived on a farm in Glocester that was, with one exception, completely encompassed by a stone wall or other similar impediments. The exception was an opening where a driveway ran from the highway to a garage. Charles C. Wilbur had been invited to come to the farm to obtain some apples. As he walked toward the orchard along a passageway between the barn and the garage, he was bitten by Gross's supposedly sightless dog. The trial justice ruled that since the farm was not completely surrounded by tangible obstructions, the bite occurred while the dog was "out of the enclosure." Gross appealed.

In *Wilbur* the late Mr. Justice William W. Moss observed that while the dog-bite statute had been involved in several cases that had come before the court, an in-depth consideration had never been given to what kind of an enclosure the General Assembly had in mind when it first enacted the proviso making a dog's owner or keeper absolutely liable for bites that occurred outside the enclosure. Mr. Justice Moss referred to the *Whittet* and *Peck* definition and cases which supposedly supported the notion that a dog owner or keeper who wished to avoid absolute liability would be required to surround his premises with some type of visible obstruction such as a wall, a fence, or a hedge; but Justice Moss emphasized that the word "enclosure" had no definite, fixed meaning because its meaning actually depended upon the context in which it was found and the legislative intent which led to the enactment of the statute.

Turning to *Peck*, Justice Moss, after noting that its definition of "enclosure" came from *Porter* v. *Aldrich*, 39 Vt. 326 (1866), where the Vermont statute gave a person the right to "impound any beast found in his enclosure doing damage," then pointed to a significant omission in the definition found

in *Peck*. *Peck*, in citing the Vermont case as support for a tangible type of boundary line, stressed that the enclosure was "for the protection of the premises against encroachment," 24 R.I. at 586, 54 A. at 382, whereas the Vermont Supreme Court actually said that the purpose of the enclosure referred to in its "impounding" statute was "for the protection of the premises against encroachment by cattle." 39 Vt. at 331. Mr. Justice Moss then went on to refer to other Vermont cases in which the term "enclosure" was defined as meaning land that is "occupied" but not "fenced." The citations used by the *Whittet* court to buttress the *Peck* definition also came under the scrutiny of Mr. Justice Moss, and he went on to demonstrate with his customary clarity that the results reached in all four cases depended either on the factual basis or on the language of the particular statute involved in each situation.

In turning his attention to Rhode Island's dog law, Mr. Justice Moss traced the origin and development of what is today §4-13-6. He noted that legislative concern with damage done by man's best friend was first expressed in 1798[2] when the General Assembly passed "An Act to prevent Sheep and Cattle from being worried and torn by Dogs." Later, in 1860,[3] the Legislature enacted a provision which now can be found in §4-13-18. It reads:

> "Any person may kill any dog that may suddenly assault him or any person of his family or in his company, while the person so assaulted is out of the enclosure of the owner or keeper of such dog."

In his historical review, Justice Moss stressed that if an individual is seeking to exercise his statutory right to kill a dog,

---

[2]P.L. 1798 at 538. This statute made the owner of a dog who kills, chases, or wounds the domestic animals of another liable for damages, and if, subsequent to the recovery of damages, the dog continues to demonstrate this behavior, its owner was liable for double damages, and the statute directs the court to order the execution of the dog. This statute is now a part of G.L. 1956 (1976 Reenactment) §4-13-16.

[3]P.L. 1860, ch. 326.

the individual must keep out of the enclosure, and once the person enters the enclosure, he loses his right to kill even if the dog subsequently assaults him within the enclosure.

In 1889[4] the Legislature amended the dog-damage law so that damages could be recovered for personal injury. In making this change, the Legislature incorporated within its new enactment the "out of the enclosure" terminology found in the 1860 statute. Mr. Justice Moss, after noting the similarity between the two statutes, concluded that the phrase "while traveling the highway or out of the enclosure," which even today is found in §4-13-16, refers to the "person" and not to the "dog." Thus, he said that the person who wishes to take advantage of the absolute liability provisions of the dog-bite law must keep out of the enclosure because the enclosure is intended to keep the person out and not the dog in.

Thanks to Mr. Justice Moss's scholarship and erudition, the court in *Wilbur* made it clear that an individual who seeks canine companionship but at the same time fears litigation need not live in a residence which is completely encircled with such medieval trimmings as a moat or fortress-like walls. The purpose of the enclosure, *Wilbur* held, is to give the entrant "reasonable notice that he is entering upon occupied premises where there may be a dog" and that requisite notice is afforded "if the premises are set apart from adjoining property by boundaries sufficiently apparent to indicate the approximate limits of occupation." Consequently, the court in *Wilbur* ruled that, notwithstanding the driveway gap, the bit occurred within the enclosure. Thus, there was no liability, and if recovery was to be had, the visitor was required to prove the owner's knowledge of the dog's vicious propensities. *See Wilbur* v. *Gross*, 56 R.I. 65, 182 A. 597 (1936).

What was said about the Glocester farm in *Wilbur* applies with equal force to the premises at 25 Valhalla Drive in Portsmouth. There was ample evidence which would indicate

---

[4]P.L. 1889, ch. 749, §1.

that a visitor making his way onto the Nine property should have noticed that he was about to enter premises on which he might be confronted with a curious, if not cantankerous dog. If the visitor insists on maintaining his course, he will not only lose the advantage of our dog-bite statute, but he also may discover that the oft-quoted adage, "Barking dogs never bite," is open to question.

In concluding, we acknowledge that in his brief Brendan's father argued at some length that the trial justice erred (1) in applying the "reasonable man" standard enunciated in *Wilbur* to his 3-year-old son and (2) in failing to modify the charge in light of our recent holdings in *Haddad* v. *First National Stores, Inc.*, 109 R.I. 59, 280 A.2d 93 (1971), and *Mariorenzi* v. *Joseph DiPonte, Inc.*, 114 R.I. 294, 333 A.2d 127 (1975). In *Haddad* we recognized that there may be times when a landowner owes a duty of care to the trespasser of tender years, and in *Mariorenzi* we abolished the distinction in the different degrees of care owed to the invitee, the licensee, and the trespasser. There are several simple and direct responses to these contentions.

Initially, we would point out that the rule promulgated in *Mariorenzi* was to be applied prospectively to those personal-injury and property-damage claims that occurred 60 days after the publication of the opinion. *Mariorenzi* was published on February 24, 1975. Tiny bit Brendan almost 2 years earlier — in April 1973. At trial, the trial justice was never asked to charge the jury that the "reasonable man" test set forth in *Wilbur* could not be applied to 3-year-old Brendan or that the principles in *Haddad*[5] were applicable to the case. As noted earlier, the sole objection to the charge given by the trial justice was to his refusal to define an "enclosure" as property which is completely encircled by some type of tangible obstruction. The trial justice told the

---

[5]We would emphasize that our references to the *Haddad* and *Mariorenzi* rulings are not to be considered as any indication that we believe those cases might modify the "reasonable man" criterion alluded to in *Wilbur*.

jury in simple and direct terms that if it found that "this dog was not within an enclosure under the law as I've given it to you, then the defendant is liable; no ifs, ands or buts * * * but if you find on the facts that the dog was within the owner's enclosure, then the defendant is not liable."

The challenge presently being made before us should have been asserted in the Superior Court by the submission to the trial justice of suitable specific requests to charge. Super. R. Civ. P. 51(b). The father's failure to take these steps now precludes any further challenge to the charge. The charge as given became the law of the case and is binding upon us as if was on the jury and the trial justice. *Powless* v. *Pawtucket Screw Co.*, 116 R.I. 158, 352 A.2d 643 (1976).

The plaintiff's appeal is denied and dismissed, the judgment appealed from is affirmed, and the case is remanded to the Superior Court.

*Corcoran, Peckham & Hayes, Kathleen Managhan, William W. Corcoran,* for plaintiff.

*Paul V. Reynolds,* for defendant.