Phillip JOHNSTON

v.

John POULIN et al.

No. 2002–0318–Appeal.

Supreme Court of Rhode Island.

March 29, 2004.

John Coughlin, Esq., Providence, for Plaintiff.

Kevin S. Cotter, Esq., for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

SUTTELL, Justice.

The plaintiff, Phillip Johnston (plaintiff or Johnston), appeals from a summary judgment in favor of the defendants, Jon[1] Poulin and Barbara Poulin. The plaintiff asserts that the motion justice erred in her statutory interpretation of G.L.1956 § 4–14–1, and that the defendants should be held strictly liable for personal injuries caused by Barbara Poulin's horse. For the reasons stated herein, we reverse the judgment of the Superior Court.

### Facts and Procedural History

Barbara Poulin is the owner of a horse named Twig that she kept fenced on her property in Foster, Rhode Island. On the night of November 10, 1997, a strong wind caused a tree branch to fall on the electric fence that corralled the horse. Unbeknownst to the Poulin family, the horse escaped from its enclosure. At approximately 11 p.m., the Foster Police Department received a report that a horse was running wild on Danielson Pike (Route 6). Patrolman Robert Bolger (Officer Bolger) and Lt. William Chapman (Lt.Chapman) responded and soon spotted the horse in the vicinity of the Breezy Hill Café. The horse continued to run on Route 6 for approximately two miles in an easterly direction. At one point Lt. Chapman, who had considerable equine experience, was

able to grab Twig's halter, but, lacking a lead-rope, was unable to secure the horse. Eventually, the officers were able to herd the horse off the road behind the Captain Isaac Paine Elementary School (Paine Elementary School), where Officer Bolger guarded the horse while Lt. Chapman attempted to ascertain the horse's owner.

Shortly before midnight, Lt. Chapman arrived at the Poulin home and spoke to sixteen-year-old Jon Poulin (Jon). His mother, Barbara Poulin, was at work at the time. After determining that Twig was missing, Jon returned with Lt. Chapman to the schoolyard and attached a lead-rope to the horse's harness.

A private citizen who had previously assisted the Foster Police Department with runaway horses was contacted and arrived with a horse trailer. According to Jon, he led Twig to the parking lot where the trailer was located. For more than forty-five minutes, efforts were made, unsuccessfully, to coax Twig into the trailer. Finally, Lt. Chapman decided to walk the horse to the nearest horse farm to board it for the night.

The plaintiff was an acquaintance of Lt. Chapman and lived about two miles from Paine Elementary School. Lieutenant Chapman knew him to be an experienced horseman with facilities capable of maintaining Twig for the night. It is undisputed that Lt. Chapman held the lead-rope at all times as he and Jon walked the tethered Twig on Route 94 for the half-hour it took to reach Johnston's barn.

By the time they arrived, Johnston had been roused from his sleep by Officer Bolger and had granted his permission to keep the horse in his barn overnight. The

---

1. In his complaint, the plaintiff identified the defendants as "John Poulin and Barbara Poulin." The correct name of the defendant, however, is "Jon Poulin." We will refer to him, therefore, by his proper name of Jon.

horse was described as being calm while Lt. Chapman walked it up Johnston's driveway. As they entered the barn, however, Twig became a little excited or nervous and reared. Once inside the barn, she calmed down a bit and was led by her halter without any struggle.

Lieutenant Chapman requested Johnston's assistance in placing the horse into the barn stall. Inside the barn, Lt. Chapman handed the lead-rope to plaintiff. Johnston walked the horse into the stall and clipped a wall rope to the halter without difficulty. He then walked past the house and left the stall to get some hay. He returned, walking along Twig's left side, and deposited the hay in a trough in front of her head. As he attempted to leave the stall, the horse pulled back and reared up, causing the wall rope to break.[2] The horse lost her footing and fell down, knocking Johnston to the ground. While the horse was attempting to get back on her feet, she struck him in the head with her hind hoof. Johnston stood up and indicated to the police that he was okay. He then joined Lt. Chapman and Jon to retrieve Twig, which had run out of the stall and was in an open field behind the barn. Twig was led from the field into the barn again, and the doors to the barn were shut, finally securing her for the night.

Following these events, Johnston went back to bed. When he woke up, however, he went to Rhode Island Hospital. He indicates in his deposition that he injured his neck, jaw and head, and suffered from bilateral shoulder pain, eye and ear pain, memory loss and headaches; that he received stitches to his head; that he was diagnosed with cerebral concussion, "post-concussion syndrome and acute cervical sprain/strain, right TMJ syndrome and an acute thoracic strain;" and that he has "feelings of explosiveness and irritability" and suffers from depression.

On May 7, 1999, Johnston filed a complaint in Superior Court alleging that the Poulins are liable for his personal injuries pursuant to (1) the strict liability provision of § 4–14–1; and (2) their negligence for willfully or recklessly allowing their horse to run wild out of the enclosure of their property. On December 27, 2001, defendants filed a motion for summary judgment. The plaintiff's cross-motion for summary judgment was filed on March 20, 2002.

On April 9, 2002, the motion justice held a hearing on the motions, after which she granted defendants' motion for summary judgment and denied plaintiff's cross-motion. The plaintiff filed a timely notice of appeal, appealing solely the issue of strict liability.[3]

### Discussion

"Summary judgment is an extreme remedy that should be applied cautiously." *Sjogren v. Metropolitan Property and Casualty Insurance Co.*, 703 A.2d 608, 610 (R.I.1997) (citing *Rotelli v. Catanzaro*, 686 A.2d 91, 93 (R.I.1996)). In its review of the grant of a motion for sum-

---

2. Jon Poulin said in his deposition that as plaintiff was sliding past the horse "he brushed her the wrong way. Twig stood up abruptly and Mr. Johnston asked the horse 'What, you have never been in a straight stall before?' and slapped Twig on her 'butt'."

3. The plaintiff effectively waived any appeal on the hearing justice's ruling on the negligence count because he did not brief the issues related to his claim for negligence. Failure to argue an asserted error of the trial court in his legal brief constitutes a waiver of the alleged error. *See Wilkinson v. State Crime Laboratory Commission*, 788 A.2d 1129, 1131 n. 1 (R.I.2002) (citing Sup.Ct.R. 16(a); *James J. O'Rourke, Inc. v. Industrial National Bank of R.I.*, 478 A.2d 195, 198 n. 4 (R.I. 1984)).

mary judgment, this Court applies the same rules and standards that govern the motion justice when passing on such a motion. *Id.* (citing *Accent Store Design, Inc. v. Marathon House, Inc.*, 674 A.2d 1223, 1225 (R.I.1996)). This Court will affirm summary judgment "if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *DiBattista v. State*, 808 A.2d 1081, 1085 (R.I.2002) (quoting *Woodland Manor III Associates v. Keeney*, 713 A.2d 806, 810 (R.I.1998)).

■■■ This Court reviews questions of statutory interpretation *de novo. State v. Fritz*, 801 A.2d 679, 682 (R.I.2002) (citing *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I.2001)). "It is well settled that when the language of a statute is clear and unambiguous, [we] must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *State v. DiCicco*, 707 A.2d 251, 253 (R.I.1998) (quoting *Accent Store Design, Inc.*, 674 A.2d at 1226). "Moreover, when we examine an unambiguous statute, 'there is no room for statutory construction and we must apply the statute as written.'" *Id.* (quoting *In re Denisewich*, 643 A.2d 1194, 1197 (R.I. 1994)).

This is a case of first impression in which we are called upon to interpret and define the term "at large" within the con-

text of § 4–14–1, as amended by P.L.1974, ch. 231, § 1. The provisions of § 4–14–1 confer strict liability upon an owner or keeper of a horse, regardless of fault, for damages caused by the horse while "at large." At the time of plaintiff's injury the statute[4] provided as follows:

> "No horse, nor bull, nor boar, nor ram, nor goat shall be permitted to *run at large;* and if the owner or keeper shall, for any reason suffer any such animal so to do he shall upon conviction thereof be fined not in excess of one hundred dollars ($100) and be liable in addition for all damages done by the animal *while so at large,* although he escapes without the fault of the owner or keeper; and the construction of any lawful fence shall not relieve the owner or keeper from liability for any damage committed by an animal of the enumerated class upon the enclosed premises of an adjoining owner." General Laws 1956 (1987 Reenactment) § 4–14–1. (Emphases added.)

Johnston asserts that the horse Twig was "at large" from the time she escaped her enclosure until at least the time she struck him in the head. In essence, he argues, the incidents that occurred during that night and the early morning of the next day constitute one continuous sequence of events, and thus the strict liability provisions of § 4–14–1 should apply.

We begin our analysis with the dictionary definition of "at large." Miriam–Webster's Collegiate Dictionary 654 (10th

---

4. The language of G.L.1956 § 4–14–1 was revised and reenacted with an effective date of December 31, 1998. It currently provides: "No horse, bull, boar, ram, or goat shall be permitted to run at large and if the owner or keeper of these, for any reason suffers any animals to do so he or she shall upon conviction be fined not in excess of one hundred dollars ($100) and be liable in addition for all damages done by the animal while at large, although the animal escapes without the fault of the owner or keeper. The construction of any lawful fence shall not relieve the owner or keeper from liability for any damage committed by an animal of the enumerated class upon the enclosed premises of an adjoining owner."

ed.2001) defines "at large" as "free of restraint or confinement." Black's Law Dictionary 122 (7th ed.1999) defines "at large" as "[f]ree; unrestrained; not under control." Furthermore, American Jurisprudence defines "running at large" as "strolling, without restraint or confinement, as wandering, roving and rambling at will without restraint." 4 Am.Jur.2d *Animals* § 50 at 390 (1995). It is clear from the various definitions that an indispensable element of the term "at large" is a lack of restraint, confinement, or control.

From the earliest times an owner of livestock was not bound to fence his close against an adjoining field, but was allowed to pasture his animals on unenclosed lands. However, "[i]t was the rule of the common law that the owner of domestic animals * * * was bound at his peril to keep them off the lands of other persons or respond in damages for their trespasses," whether or not he was negligent. *See McKee v. Trisler*, 311 Ill. 536, 143 N.E. 69, 71 (1924).

Several sister jurisdictions have had occasion to consider the term "at large" in statutes similar to § 4–14–1. The Vermont Supreme Court affirmed that a jury instruction was correct in stating, "if the horse, after the defendant left it to go back home, was out of control of him and his son, and running about in the highway, at liberty to follow its own instincts and inclinations, and to go wherever it would, it was running at large * * *." *Russell v. Cone*, 46 Vt. 600, 604 (1873).

The Michigan Supreme Court noted that the "term has been defined many times by the courts under similar statutes, and the rule is well settled that 'running at large' means 'strolling without restraint or confinement; rambling at will.'" *Eklund v. Toner*, 121 Mich. 687, 80 N.W. 791, 791 (1899). The Connecticut Supreme Court followed the same line of reasoning, stating, "'at large' signifies that the animals

are suffered to roam about without a keeper and without restraint." *Dixon v. Lewis*, 94 Conn. 548, 109 A. 809, 810 (1920).

The Wisconsin Supreme Court concluded that control of the animal was integral to the definition of at large. "An animal which is unattended and untethered in the street is as much at large when in front of its master's premises as in any other part of the street." *Decker v. McSorley*, 111 Wis. 91, 86 N.W. 554, 555 (1901). In construing an Ohio statute relating to cruelty to animals, its court of appeals stated, "[i]t is our opinion that a dog is at large when a vagrant, when it runs at will, when it is absolutely beyond control or call and is acting on his own initiative, and under such circumstances wherein there is no connection, physical or sympathetic, between the dog and the master." *Uebele v. State*, 21 Ohio App. 459, 153 N.E. 215, 216 (1926).

In *Groenhoff v. Whisler*, 199 Iowa 754, 202 N.W. 587, 587 (Iowa 1925), the plaintiff took possession of a steer that escaped from the defendant's property. On the third day of such possession, the steer allegedly killed the plaintiff's bull. *Id.* While recognizing that the achievement of the steer was "perhaps never excelled in bovine annals," the Iowa Supreme Court held that

> "[a]fter the plaintiff took possession of the steer, he [the steer] was no longer running at large. The plaintiff rightfully assumed temporary control over him, and became charged with the same duty of reasonable care as any bailee. Reasonable care included reasonable control of the animal. The defendant was not in control of him." *Id.*

The Kansas Supreme Court opined that a bull that broke into a feed lot containing fat cattle, causing one to die and approximately fifty head to fail to "eat properly or put on flesh," was "not running at large

when it was being driven along the road by its owner and his employee." *Bertram v. Burton*, 129 Kan. 31, 281 P. 892, 893, 894 (1929). "To be at large means to be free and unrestrained. A dog is quite generally obedient to its master and is not at large when accompanying or following its master, but is under control." *Dalton v. Dean*, 175 Tenn. 620, 136 S.W.2d 721, 722 (1940).

The distinguishing factor in determining whether an animal is "at large" is the presence or absence of control. If an animal is roaming at will and free to follow its own instincts, it may be said to be "at large." If, however, it is either physically restrained or subject to the moral authority of the person in charge, it is not "at large." *See Commonwealth v. Dow*, 51 Mass. 382, 386 (1845) (dog, loose and following the person in charge of him at such a distance that the person could not exercise that control over the dog which would prevent mischief, was "going at large").

The plaintiff urges us to adopt a more expansive interpretation of § 4–14–1. He asserts that the horse was "at large" from the time it escaped until such time as it is returned to its "home," and that the owners are strictly liable for all damages done outside the horse's enclosure. We do not believe, however, that the Legislature ever intended to impose strict liability on an owner for damages caused by his or her animal, after that animal clearly came under the physical control of another person. We conclude, therefore, that whether an animal is "at large" depends on whether there is control and restraint exercised over the animal while it is off its owner's premises.

A comparison with G.L.1956 § 4–13–16, the so-called "dog-bite" statute, wherein strict liability attaches for any injury occurring outside the dog's enclosure, also is instructive. Section 4–13–16 provides in part:

"If any dog kills, wounds, worries, or assists in killing, wounding or worrying, any sheep, lamb, cattle, horse, hog, swine, fowl, or other domestic animal belonging to or in the possession of any person, or assaults, bites, or otherwise injures any person while traveling the highway or *out of the enclosure of the owner or keeper of that dog,* the owner or keeper of the dog shall be liable to the person aggrieved, for all damage sustained, to be recovered in a civil action, with costs of suit." (Emphasis added.)

It is clear that if the Legislature intends to, it is able directly to impose liability on an animal owner whenever a person is injured outside the animal's enclosure. It has been established that "the clause 'while traveling on the highway or out of the enclosure of the owner or keeper of such dog' modifies the word 'person' and not the word 'dog.'" *Wilbur v. Gross*, 55 R.I. 473, 478, 182 A. 597, 599 (1936). Therefore, the dog-bite statute imposes strict liability in any circumstance wherein the dog is *outside* of its owner's enclosure. The plaintiff asks us to interpret the statute at issue to obtain the same result as the dog-bite statute, even though the language does not provide support for this interpretation.

The strict liability of the dog-bite statute is predicated on the location of the dog at the time of injury. The strict liability of the statute at issue is predicated upon the conduct of the horse at the time of injury: Is the horse roaming and wandering under its own free will, or is it restrained or controlled by another? If the Legislature intended to predicate strict liability upon the basis of the horse's location alone, it could have constructed the statute to mirror the dog-bite statute, a statute enacted

fifty years before the statute at issue was enacted. The Legislature instead chose not to do so, but instead predicated liability solely based on the status of the horse, i.e., whether or not the horse was "at large" at the time of injury.

We further recognize, however, that when dealing with animals the question of control more often than not is a process, rather than an event fixed in time. As the facts of this case so keenly illustrate, the point at which a horse on a romp may be said to be under effective control is not readily discernible. Was it when the Foster police were able to herd Twig off Route 6 and behind the Paine Elementary School? Or when Jon Poulin was able to attach a lead-rope to the horse's harness? Was it during the forty-five minutes that Lt. Chapman attempted to coax Twig into the trailer? Was it on the one-half hour trek to plaintiff's barn? Was it when Twig was placed in a stall and a wall rope clipped to her harness? Or indeed had Twig not been brought under control at all when she reared up, broke the wall rope, and knocked plaintiff to the ground? The answer, we conclude, is not so readily apparent.[5]

█ We are of the opinion, therefore, that the question of when an animal specified in § 4–14–1 ceases to be "at large" presents a mixed question of law and fact. "A mixed question of law and fact is one in which 'the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.'" *Direct Action for Rights and Equality v. Gannon*, 819 A.2d 651, 662 (R.I.2003) (quoting *Pullman–Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982)).

█ Here, we hold that an animal is at large when it is free, unrestrained, at liberty to follow its own instincts, and not under effective control. The question of at what point in time—if at all—Twig ceased to be at large, however, is a question of fact to be resolved by the trier of fact.[6]

█ After reviewing the trial transcript, we conclude that the trial justice, "though * * * partly in the right," also was in the wrong, and that she misconceived material evidence by specifically excluding the "excitability" of the horse from consideration in determining whether the horse was "at large." In this case there are statements in the affidavits upon which the fact-finder reasonably might conclude that, at the time of the plaintiff's injury, Twig still was in a state of excitability, such that she never had been effectively brought under control. On the other hand, there are statements which also could reasonably lead to the conclusion that Twig had been restrained and indeed brought under control before the plaintiff was injured.

### Conclusion

We conclude, therefore, that summary judgment in this matter was inappropriate. Accordingly, we reverse the judgment and remand the papers to the Superior Court

5. The facts of this case evoke the predicament faced by the six gentlemen in John Godfrey Saxe's whimsical poem "The Blind Men and the Elephant," who "Disputed loud and long/ Each in his own opinion/Exceeding stiff and strong/Though each was partly in the right/ And all were in the wrong!" John Godfrey Saxe, *The Blind Men and the Elephant, in* The Best Loved Poems of the American People 521, 522 (1936).

6. Although some of the factors that may be relevant in determining whether a horse is at large are easily identifiable, we decline to speculate about what factors may be germane when a bull or a boar are at issue.

for further proceedings consistent with this opinion.